```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X          For Online Publication Only
BENJAMIN LANDA,

                                    Plaintiff,          **ORDER**
                                                        22-CV-1825 (JMA) (ARL)
           -against-                                    **FILED**
                                                        **CLERK**
AMERICAN PROSPECT, INC., MAUREEN
TKACIK, and DAVID DAYEN,                                11:50 am, Aug 16, 2023

                                                        **U.S. DISTRICT COURT**
                                                        **EASTERN DISTRICT OF NEW YORK**
                                    Defendants.         **LONG ISLAND OFFICE**
------------------------------------------------------------------X
```

**AZRACK, United States District Judge:**

Before the Court is the motion filed by Defendants American Prospect, Inc. ("American Prospect"), Maureen Tkacik ("Tkacik"), and David Dayen ("Dayen," and collectively "Defendants") seeking dismissal of Plaintiff Benjamin Landa's ("Landa") Amended Complaint, for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). (See Defendants' Motion to Dismiss ("Defendants' Motion"), ECF No. 12.) For the reasons set forth herein, Defendants' Motion is granted in its entirety.

## I. BACKGROUND

The following facts, set forth in the Amended Complaint and the attached exhibits, are presumed true for purposes of Defendants' motion to dismiss.

**A. Background Defendants' Publication of the Article**

Plaintiff is a New York resident who "is a known and successful operator of nursing homes." (See Amended Complaint ("AC"), ECF No. 10, ¶ 8.) Defendant American Prospect is a Washington D.C.-headquartered Section 501(c)(3) corporation that operates a publication known as "The American Prospect." (Id. ¶¶ 2, 9.) Defendant Dayen, a Californian, is The American Prospect's executive editor, while Defendant Tkacik, a Washington, D.C. resident, is one of The

1

American Prospect's writers.  (Id. ¶¶ 10-11.)

On or about January 26, 2022, American Prospect published an article written by Tkacik, on The American Prospect's website, entitled "The Nursing Home Slumlord Manifesto" (the "Article").  (Id. ¶ 13; see also Article, ECF No. 12-5.)  The Article opens with a brief examination of New York's "Safe Staffing Law," which was signed by former New York Governor Andrew M. Cuomo in April 2021, and – had portions not been struck down by the New York Court of Appeals as unconstitutional – would have required nursing homes to spend the majority of their revenue on patient care.  (See generally Article.)  According to the Article, this law was "bound to run afoul of New York's incomprehensibly powerful nursing home mafia," of which Plaintiff is allegedly a member.  (Id.)  The Article also focused on a December 2021 lawsuit filed by multiple nursing homes, owners, and operators, including Plaintiff, that challenged the constitutionality of the "Safe Staffing Law."  (Id.; see also AC ¶ 15.)

The Article examines Plaintiff's role as a nursing home owner and operator, as well as his role in the nursing home industry.  In doing so, the following statements (collectively, the "Statements") appear in the Article:

- Plaintiff's "documented crimes range from human trafficking to flagrant Medicare and Medicaid fraud to staffing his homes so minimally that patients regularly die from literally rotting in their own filth – or in the case of one more ambulatory resident, attempting to escape his misery by climbing out of a third-story window."  (AC ¶ 17.)

- "In a single year, a *single* nursing home owned by Landa's family took in some $13.1 million in revenues that would have been "confiscated" under the safe staffing law[.]"  (Id. ¶ 25, italics in original)

- "The most lucrative homes are not exactly the same as the most gruesome ones: The most profitable nursing homes must fill most of their beds with short-term Medicare patients recovering from surgeries, and those patients tend to try hard to steer clear of the most notorious death traps."  (Id. ¶ 29.)

- "[O]f the 18 New York nursing homes the Centers for Medicare & Medicaid Services

2

designates "Special Focus Facilities" [1] or SFF candidates on its annual compendium of the nation's most dangerous nursing homes, ten are owned by members or associates of the Landa nursing home gang." (Id. ¶ 30.)

- "Several other nursing homes that are plaintiffs in the subject federal lawsuit are 'connected to the Landa elder abuse keiretsu.'" (Id. ¶ 38.)

**B. Post-Article Communications and Plaintiff's Complaint**

On January 27, 2022, Plaintiff's counsel sent a letter to Dayen demanding that The American Prospect remove the Article from its website. (Id. ¶ 61.) Dayen declined to do so, and responded that he had, in fact, verified the Statements' veracity. (Id. ¶ 62.)

In response, on or about February 18, 2022, Plaintiff filed a lawsuit against Defendants in New York Supreme Court, Nassau County, asserting state law claims for libel and libel per se. (See ECF No. 1-2.) Defendants removed the matter to federal Court on April 1, 2022. (See Notice of Removal, ECF No. 1.) One week later, Defendants filed a pre-motion conference letter seeking leave to file a motion to dismiss Plaintiff's Complaint, which Plaintiff opposed. (See ECF Nos. 5-6.) After a pre-motion conference, Plaintiff filed an Amended Complaint and Defendant then filed the instant motion to dismiss. (See ECF Nos. 8-9; May 31, 2022 Electronic Order.)

For the following reasons, the Court finds that Plaintiff has failed to plausibly allege his libel or libel per se claims. The Court thus grants Defendants' motion to dismiss and dismisses Plaintiff's Amended Complaint with prejudice.

## II. DISCUSSION

**A. Legal Standard**

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a plaintiff must allege sufficient facts "to state a claim to relief that is plausible on its face." Bell

---

[1] "Special Focus Facilities" are those facilities identified as having "a history of serious quality problems." (See ECF No. 12-14 at 1.)

Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).  A claim is facially plausible only "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 556).  Mere labels and legal conclusions will not suffice.  Twombly, 550 U.S. at 555.  In reviewing a motion to dismiss, the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff.  See Dobroff v. Hempstead Union Free School Dist., No. 21-cv-1567, 2022 WL 4641128, at *4 (E.D.N.Y. Sept. 30, 2022) (citing Cleveland v. Caplaw Enters., 448 F.3d 518, 521 (2d Cir. 2006)).  A court may also consider materials attached to the complaint, materials integral to the complaint, and materials incorporated into the complaint by reference.  See Sira v. Morton, 380 F.3d 57, 67 (2d Cir. 2004).  Further, a court may also take judicial notice of a document filed in another court to establish that document's filing.  See In re Olympia Off. LLC, 585 B.R. 661, 667 (E.D.N.Y. 2018) (citing Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc., 969 F.2d 1384, 1388 (2d Cir. 1992)).

**B. Analysis**

1. Applicable New York Law

Plaintiff contends that each of the Statements are defamatory, and that Defendants' publication of the Statements in the Article constitutes libel.  Defendants, on the other hand, contend that each one of the Statements is either:  (i) privileged from liability under New York law; or (ii) a non-actionable opinion.  As New York is the forum state, New York law applies to the parties' instant matter, which is before this Court on diversity grounds.  See BYD Co. Ltd. v. VICE Media LLC, 531 F. Supp. 3d 810, 818 (S.D.N.Y. 2021), aff'd, 21-cv-1097, 2022 WL 598973 (2d Cir. Mar. 1, 2022), cert. denied, 143 S. Ct. 103 (2022).

New York law defines defamation as the injury to one's reputation either by written (libel) or oral expression (slander). See generally Morrison v. Nat'l Broad. Co., 19 N.Y.2d 453 (N.Y. 1967). A plaintiff must establish five elements to make out a libel claim: (1) a written defamatory statement of and concerning the plaintiff; (2) publication to a third party; (3) fault, consisting either of negligence or actual malice; (4) falsity of the defamatory statement; and (5) special damages or per se actionability. Kesner v. Dow Jones & Co., Inc., No. 22-cv-875, 2023 WL 4072929, at *1 (2d Cir. June 20, 2023) (citing Palin v. N.Y. Times Co., 940 F.3d 804, 809 (2d Cir. 2019); Celle v. Filipino Rep. Enters. Inc., 209 F.3d 163, 176 (2d Cir. 2000)). Falsity is a necessary element of a defamation claim and because "only 'facts' are capable of being proven false, it follows that only statements alleging facts can properly be the subject of a defamation action." Ctr. for Med. Progress v. Planned Parenthood Fedn. of Am., 551 F. Supp. 3d 320, 325-26 (S.D.N.Y. 2021), aff'd sub nom. Daleiden v. Planned Parenthood Fedn. of Am., No. 21-cv-2068, 2022 WL 1013982 (2d Cir. Apr. 5, 2022) (quoting Rosner v. Amazon.com, 18 N.Y.S.3d 155, 157 (2d Dep't 2015)). Moreover, a "substantially true" statement cannot supply the basis for a defamation claim under New York law. See Tannerite Sports, LLC v. NBCUniversal News Grp., 864 F.3d 236, 242-43 (2d Cir. 2017) (quoting Biro v. Conde Nast, 883 F. Supp. 2d 441, 458 (S.D.N.Y. 2012)) ("[A] statement is substantially true if the statement would not have a different effect on the mind of the reader from that which the pleaded truth would have produced.").

New York recognizes a fair-report privilege, which is codified in Section 74 of New York's Civil Rights Law and provides absolute immunity "for the publication of a fair and true report of any judicial proceeding, legislative proceeding[,] or other official proceeding, or for any heading of the report which is a fair and true headnote of the statement published." Kesner, 2023 WL 4072929, at *1 (quoting N.Y. Civ. Rights Law § 74); see also Gottwald v. Sebert, 2023 N.Y. Slip

Op. 03183, 2023 WL 3959051, at *2 (N.Y. June 13, 2023) (quoting Holy Spirit Ass'n for Unification of World Christianity v. New York Times Co., 49 N.Y.2d 63, 67 (1979)) ("The statutory privilege applies to 'the publication of a fair and true report of any judicial proceeding' (Civil Rights Law § 74) where 'the substance of the [statement is] substantially accurate.'"). This privilege may be asserted as an affirmative defense to a claim of defamation. Mistretta v. Newsday Media Group, 200 A.D.3d 775, 777 (2d Dep't 2021), lv to appeal denied, 38 N.Y.3d 902 (N.Y. 2022) (citing Burke v. Newburgh Enlarged City Sch. Dist., 195 A.D.3d 674, 676 (2d Dep't 2021)).

2. Allegedly Defamatory Statements

Here, Plaintiff contends that he was defamed by the Article, while Defendants argue that the Statements cannot support Plaintiff's defamation claims. At the motion to dismiss stage, the Court "must decide whether the statements, considered in the context of the entire publication, are reasonably susceptible of a defamatory connotation, such that the issue is worthy of submission to a jury." Palin, 940 F.3d at 809; see also Ctr. for Med. Progress, 551 F Supp 3d 320, 325-26 (quoting Adelson v. Harris, 973 F. Supp. 2d 467, 481 (S.D.N.Y. 2013), aff'd, 876 F.3d 413 (2d Cir. 2017) ("Because a defamation suit may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself, courts should, where possible, resolve defamation actions at the pleading stage."). Thus, allegedly defamatory statements "must be perused as the average reader would against the 'whole apparent scope and intent' of the writing." Celle, 209 F.3d at 177 (quoting November v. Time Inc., 13 N.Y.2d 175, 178 (N.Y. 1963)).

a. *Human Trafficking*

Plaintiff first asserts that the Article's reference to his involvement in "human trafficking" is false and defamatory, while Defendants contend that it is both "substantially true" and protected by Section 74. In the Article, the term "human trafficking" hyperlinks to a news article entitled

"200 Filipino nurses in NYC win human trafficking suit," which discusses a lawsuit in which the plaintiff, a Filipina nurse, brought a class action against Plaintiff (and other defendants) for violations of the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. §§ 1589 et seq.[2] (See ECF No. 12-7; see also Paguirigan v. Prompt Nursing Empl. Agency LLC, No. 17-cv-1302, 2019 WL 4647648, at *1 (E.D.N.Y. Sept. 24, 2019), aff'd in part, appeal dismissed in part, 827 Fed. App'x 116 (2d Cir. 2020).) There, the Honorable Nina R. Gershon granted plaintiff's summary judgment motion as to liability, see Paguirigan, 2019 WL 4647648, at *19, and held Plaintiff and his co-defendants liable for at least $1.56 million in damages. See Paguirigan, 2021 WL 2206738, at *6-7 (E.D.N.Y. June 1, 2021).

While Plaintiff does not deny that Judge Gershon found him liable for TVPA violations (i.e. – "human trafficking"), he asserts that the Article's characterization of this finding was inaccurate because, at the time of publication, the parties had reached an informal settlement and sought Judge Gershon's vacatur of her summary judgment order. That motion, however, was still pending when the Article was published and did not vitiate Judge Gershon's finding that Plaintiff had violated the TVPA.[3] The Court thus finds that the Article's reference to Plaintiff's involvement in "human trafficking" was both "substantially true" as well as a "fair report" of Judge Gershon's summary judgment order, and thus cannot serve as the basis for Plaintiff's defamation claims.

---

[2] Defendants' motion to dismiss includes over two dozen exhibits, including the Article and the articles to which the Article hyperlinks, which they ask the Court to consider in analyzing their motion. Plaintiff has not objected to the Court's consideration of any of these documents. The Court also finds that these documents can all appropriately be considered on the motion to dismiss.

[3] Judge Gershon did not grant the Paguirigan parties' joint motion to vacate until almost four months after the Article's publication. See Paguirigan, No. 17-cv-1302, ECF No. 185.

7

b. *Medicare and Medicaid Fraud*

Plaintiff next challenges the Article's statement regarding his involvement in "Medicare and Medicaid fraud" as defamatory. Defendants again contend that this statement is both "substantially true" and protected by Section 74. This phrase hyperlinks to a Village Voice article entitled "The Sick Looting of Home Health Care," which recounts various incidents of alleged Medicaid fraud (and other issues), including a $3.7 million payment by Excellent Home Care, LLC (one of Plaintiff's companies) in settlement of allegations by the New York Attorney General that the company "knowingly presented, or caused to be presented, false claims to Medicaid." (See ECF No. 12-8 (Village Voice article); see also ECF Nos. 12-9 (New York Attorney General press release regarding settlement); 12-10 (settlement agreement signed by Plaintiff)).

Plaintiff's argument in his brief that the hyperlinked article references an entity with which Plaintiff was wholly uninvolved is unavailing. Indeed, that article specifically states that Plaintiff was the co-owner of Excellent Home Care, and that "Excellent settled the 'Home Alone'[4] charges, agreeing to a $3.7 million payment." (See ECF No. 12-8 at 2-4.) Moreover, Plaintiff, in his capacity as Excellent Home Care's "Managing Member," settled the Medicare and Medicaid fraud allegations brought by the New York Attorney General against Excellent Home Care. (See ECF Nos. 12-9; 12-10.) The Article's reference to Plaintiff's involvement in "Medicare and Medicaid fraud" was both "substantially true" as well as a "fair report" of the Village Voice's account of the legal proceedings involving Excellent Home Care. It cannot serve as the basis of his defamation claims.

---

[4] According to the New York Attorney General's Office, Operation "Home Alone" was an investigation into a "statewide range of fraudulent practices and schemes in the home health care industry by home health and personal care aides, the schools that train[ed] them, and the agencies that recruit[ed] and employ[ed] them." (See ECF No. 12-9 at 2.)

    c. *Staffing Deficiencies*

Plaintiff next challenges the Article's statement that his nursing homes were staffed "so minimally that patients regularly die[d] from literally rotting in their own filth – or in the case of one more ambulatory resident, attempt[ed] to escape his misery by climbing out of a third-story window." (Article at 4, emphasis added.) Defendants again contend that these statements fall under Section 74's protection. The underlined passages link to a pair of news articles, both from the Buffalo News, entitled: (1) "After nursing home stay, bedsores lead to man's agonizing death" ("Bedsores"); and (ii) "Lawsuit: 'Negligent' care led to fatal fall of Emerald South nursing home resident" ("Negligent Care"). (See ECF Nos. 12-11 (Bedsores); 12-12 (Negligent Care).) Bedsores discusses a pair of lawsuits filed against a Plaintiff-affiliated nursing home by families of patients who developed bedsores, and states (based on government data) that the New York State Health Department "cited the facility three times from 2015 through 2018 for failing to provide proper treatment and prevention of bedsores to other residents." (See Bedsores at 2.) Negligent Care similarly reports on a lawsuit brought against Plaintiff, his wife, and the Emerald Care nursing home, alleging negligence in the failure to provide adequate care to a patient (Strasner) who ultimately died. (See Negligent Care at 2-4; see also ECF No. 12-13 (Strasner Complaint).) Negligent Care further notes that another of Plaintiff's partially owned nursing homes was fined $20,000 by the New York State Health Department for two separate failures to protect residents who died while under the nursing home's care. (See Negligent Care at 2-4.)

Plaintiff does not dispute that these nursing homes faced lawsuits for their allegedly negligent patient care or were cited for staffing deficiencies. Instead, he appears to argue that his affiliation with those homes is too attenuated for their misconduct to be attributed to him. The Court disagrees. In the lawsuit referenced in Negligent Care, Plaintiff is a named defendant, and

9

the complaint claims that he and his wife are "individually liable for negligent management, and negligent financial decisions that resulted in negligent, careless and reckless care, including but not limited to, failing to provide sufficient staff, failing to properly train staff, and otherwise providing insufficient resources necessary to provide proper services and care to residents." (See ECF No. 12-13 at ¶ 37.) Moreover, in the lawsuit referenced in Bedsores, Plaintiff's wife is a named defendant, along with the nursing home itself. (See generally ECF No. 12-27.) Based on its review of these sources, the Court again concludes that the Article's statements regarding the alleged understaffing of Plaintiff's nursing homes is a "fair and accurate" account of the government records and published news sources citing those records, thus rendering this statement immune to Plaintiff's defamation claims.

   d.  *Income Confiscation Under "Safe Staffing Law"*

Plaintiff next takes issue with the Article's statement that a nursing home "owned by Landa's family took in some $13.1 million in revenues that would have been 'confiscated' under the safe staffing law." (Article at 4.) In response, Defendants contend that this statement: (i) is not defamation as a matter of law; and (ii) falls under Section 74's protection. The Court agrees.

For a statement to constitute actionable defamation, it must expose the plaintiff to disgrace or "induce an evil opinion." See Fairstein v. Netflix, Inc., 553 F. Supp. 3d 48, 63 (S.D.N.Y. 2021) (citing Rinaldi v. Holt, Rinehart & Winston, Inc., 42 N.Y.2d 369, 379-81 (1977)). The statement at issue follows a discussion of New York's "Safe Staffing Law," which, according to the Article, "permits state health authorities to claw back any profits in excess of a 5% margin to finance a state fund for adding staff at financially struggling facilities." (Article at 2.) As a threshold matter, Plaintiff does not explain how this statement—that a nursing home owned by him is *profitable*—

is injurious to his reputation, nor how it exposes him to any kind of disgrace. His defamation claim as to this statement fails on this basis alone.

Plaintiff's libel claims also fail because the Amended Complaint's conclusory allegations do not plausibly allege that this statement is materially false or that Plaintiff has been financially or reputationally harmed by this purportedly false statement. Notably, Plaintiff alleges, in conclusory fashion, that this statement is false, but does not allege what his revenues were or what amount of his revenues would be subject to confiscation under the "Safe Staffing Law."

Relatedly, Plaintiff's pleadings in the lawsuit challenging the "Safe Staffing Law" further undermine the plausibility of his libel claim. One of the Article's main subjects is the lawsuit filed by numerous nursing homes to challenge the constitutionality of the "Safe Staffing Law." (See Article at 2.) Not only does Plaintiff acknowledge that he is a plaintiff in that lawsuit, see AC ¶ 15, but several of the plaintiff facilities are owned or otherwise affiliated with Plaintiff. (See generally ECF No. 12-6.) That lawsuit explicitly argues that the "Safe Staffing Law" "effects an unconstitutional taking of Plaintiffs' private property for a public purpose, by confiscating [p]laintiffs' profits" and that each of the plaintiffs "will likely be required to turn over to the State" various amounts if the law is implemented. (See id. ¶¶ 14, 290.) Because the Article essentially paraphrases these paragraphs of the complaint at issue, the fair report privilege applies and renders this statement immune to Plaintiff's defamation claims. See Lacher v. Engel, 33 A.D.3d 10, 17 (1st Dep't 2006).

e. *Special Focus Facilities or Candidates*

Plaintiff next asserts that the Article's statement that some of the nursing homes "owned by members or associates of the Landa nursing home gang are designated as 'Special Focus Facilities' or 'SFF candidates,'" see Article at 4, "falsely claims that the nursing homes [Plaintiff]

11

is affiliated with are designated as Special Focus Facilities [("SFFs")] by the Center for Medicare & Medicaid Services." (AC ¶ 30.) Defendants argue that Plaintiff's assertion is an overgeneralization and invoke Section 74's fair reporting privilege.

The Court initially rejects Plaintiff's argument that the Article claims that <u>all</u> nursing homes affiliated with Plaintiff are SFFs. This argument simply misquotes the Article. Some of the nursing homes at issue are only SFF "candidates." (<u>See generally</u> ECF No. 12-14.)

Moreover, the statement at issue is not false because the Centers for Medicare & Medicaid Services' SFF List indicates that many of Plaintiff's family members and business affiliates have stakes in at least four New York facilities on the list, including: (i) The Citadel Rehabilitation and Nursing Center at Kingsbridge (SFF candidate); (ii) The Villages of Orleans Health and Rehabilitation Center (designated SFF); (iii) Bishop Rehabilitation and Nursing Center (SFF candidate); and (iv) The Grand Rehabilitation at Guilderland, at Barnwell and Utica (SFF candidates). (<u>See</u> Article at 4-6; <u>see also</u> ECF Nos. 12-14; 12-15; 12-16; 12-17; 12-18.). Section 74's fair report privilege applies to the Article's statement about the SFF list—which recounts this administrative determination—rendering it immune to Plaintiff's defamation claims.

Plaintiff does not, and frankly, cannot, deny these facts. Instead, he argues that the Article's definition of his "gang" is overbroad and defamatory. This argument is misplaced, however, as the definition of a "gang" in this context is Defendants' non-actionable opinion. <u>See</u> <u>Tannerite Sports</u>, 135 F. Supp. 3d at 233 (quoting <u>Egiazaryan v. Zalmayev</u>, 880 F. Supp. 2d 494, 512 (S.D.N.Y. 2012)) ("terms of relation and association often have meanings that are 'debatable, loose, and varying,' rendering the relationships they describe insusceptible of proof of truth or falsity").

f. *Connections to "Landa Elder Abuse Keiretsu"*

Plaintiff next objects to the Article's statement that some of the plaintiffs in the Safe Staffing" lawsuit are "connected to the Landa elder abuse keiretsu."[5] Defendants contend that, based on a combination of Plaintiff's admissions and their own opinions, this statement about "elder abuse" is not defamatory. As a threshold matter, the Court concludes, as it has above, that Defendants' reporting that Plaintiff and some of his nursing homes are plaintiffs in a lawsuit is not, by itself, defamatory. See Fairstein, 553 F. Supp. 3d at 63 (citing Rinaldi, 42 N.Y.2d at 379-81).

Moreover, the Court rejects Plaintiff's invitation to review Defendants' use of the term "elder abuse" in a vacuum, as opposed to within the context of the Article. In determining whether an assertion is a non-actionable opinion, courts consider the context in which the statement was made. See Graterol-Garrido v. Vega, No. 20-cv-4209, 2022 WL 2663493, at *8 (S.D.N.Y. July 11, 2022), appeal dismissed, 2023 WL 4567173 (2d Cir. Feb. 8, 2023) (quoting Levin v. McPhee, 119 F.3d 189, 197 (2d Cir. 1997)) ("New York courts look to the immediate context and the broader social context of the statement[s] and evaluate the impact that the statements would have on a reasonable reader."). Further, where a statement "discloses the facts on which it is based," it is an "opinion [which] is not actionable." Ganske v. Mensch, 480 F. Supp. 3d 542, 554 (S.D.N.Y. 2020) (quoting Levin, 119 F.3d at 197).

From the outset, the Article clearly represents its author's point of view. From its title ("The Nursing Home Slumlord Manifesto") and sub-heading (describing the "Safe Staffing"

---

[5] Neither party explicitly defines "keiretsu," which the Court takes to mean a "powerful alliance of businesses often linked by cross-shareholding." (See *Keiretsu*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/keiretsu (last visited Aug. 15, 2023). Plaintiff does not explicitly argue that the use of this term is defamatory. In any event, any such claim would fail as Defendants' use of the term amounts to a non-actionable opinion.

lawsuit as "surreal"), it is apparent that the Article is not an unbiased analysis of problems at nursing homes, but makes rather clear to readers that it is an opinion that takes a critical view of certain actions by nursing home owners, including Plaintiff. (See, e.g., Article at 2 (describing the "Safe Staffing Law" as a "refreshingly bullshit-free blueprint for fixing one of the most pointlessly horrifying features of 21st-century American healthcare: Virtually every institution in the business of caring for the sick is chronically, deliberately, and murderously understaffed….")) The Article similarly mentions "merciless cost cutting" in the nursing home industry and dubs the "rationale" for the Safe Staffing Lawsuit as "preposterous" and "craz[y]," while arguing that Plaintiff and his affiliates are "ruthless" and have engaged in "raw opportunism." (See id. at 2-3, 7.) Given this context, the Court finds that the Article's use of the term "elder abuse," while certainly hyperbolic and inflammatory, reflects Tkacik's subjective assessment of the purported maltreatment of the nursing home residents referenced in the Article, whose accounts are based upon Section 74-protected facts. See, e.g., Small Bus. Bodyguard Inc. v. House of Moxie, Inc., 230 F. Supp. 3d 290, 312 (S.D.N.Y. 2017) (quoting Chau v. Lewis, 771 F.3d 118, 129 (2d Cir. 2014)) ("[T]he epithets…'sucker,' 'fool,' 'frontman,' 'industrial waste,'…and 'crooks or morons'…are hyperbole and therefore not actionable opinion."); Arias-Zeballos v. Tan, No. 06-cv-1268, 2008 WL 833225, at *12 (S.D.N.Y. Mar. 28, 2008) (allegations that plaintiff engaged in behavior that "amounted to 'domestic violence'" were "plainly hyperbolic statements of opinion"). Accordingly, the Court concludes that Plaintiff's defamation claims may not be based on Defendants' statements regarding perceived "elder abuse."

    g. *"Notorious Death Traps"*

Plaintiff similarly challenges the Article's use of the term "notorious death traps," which he alleges connotes that he operates facilities where residents die unnecessarily. Defendants again

contend that this term is not defamatory because it is not directed at Plaintiff's nursing homes and, even if that was the case, such a use would be non-actionable and protected by Section 74.

Initially, the Article does not label any nursing home with which Plaintiff is affiliated as a "notorious death trap." Indeed, the Article merely observes that short-term Medicare patients who are recovering from surgeries "tend to try hard to steer clear of the most notorious death traps." Plaintiff's complaint misquotes the actual Article. Plaintiff's libel claim fails as this "notorious death traps" statement does not even refer to Plaintiff's nursing homes.

Moreover, Plaintiff does not even attempt to allege how this statement has financially or reputationally harmed him; this failure is fatal to his defamation claims on this basis. See Fairstein, 553 F. Supp. 3d at 63 (citing Rinaldi, 42 N.Y.2d at 379-81).

Moreover, even assuming, that this statement directly concerns one or more of Plaintiff's nursing homes, it would not provide a basis for a defamation claim, because the Article supports its contentions with Section 74-protected facts. (See Article at 4; see also ECF Nos. 12-12; 12-13.) Defendants' "notorious death traps" statement thus may not support Plaintiff's defamation claims.[6]

### III. CONCLUSION

For the foregoing reasons, the Court finds that Plaintiff has failed to plead facts sufficient to support his libel or libel per se causes of action. Accordingly, the Court grants Defendants' motion to dismiss and dismisses Plaintiff's Amended Complaint with prejudice. The Clerk of the Court is respectfully directed to close the case.

---

[6] Based on Plaintiff's above failures to sufficiently allege facts to support his defamation claims, the Court need not entertain the parties' arguments regarding Defendants' "actual malice" in publishing the Article.

**SO ORDERED.**

Dated: August 16, 2023
      Central Islip, New York

                                         /s/ (JMA)
                                    JOAN M. AZRACK
                                    UNITED STATES DISTRICT JUDGE